The defendant was indicted and convicted for two separate cases of embezzlement in *Page 1385 
violation of Alabama Code Section 13-3-20 (1975). Sentence was two years' imprisonment in each case. Six issues are presented on appeal.
 I
Initially, the defendant argues that the evidence is insufficient to support his convictions because there is no evidence of fraudulent intent and nothing to connect him with any embezzlement conspiracy.
Embezzlement is a statutory crime defined by Section 13-3-20:
 "Any officer, . . . of any incorporated company, . . . who embezzles or fraudulently converts to his own use or the use of another, or fraudulently secretes with intent to convert to his own use or the use of another, any money or property which has come into his possession by virtue of his office, agency, employment . . . shall be punished, on conviction, as if he had stolen it."
In order to sustain the convictions as charged, it was essential that the prosecution establish (1) that the defendant was an officer, agent, clerk, employee or servant of the corporation Life Insurance Company of America; (2) that certain money or checks came into his possession by virtue of his employment; and (3) that he fraudulently converted to his own use or the use of another, or fraudulently secreted with the intent to convert to his own use or the use of another, certain money or checks which came into his possession. Pullam v.State, 78 Ala. 31, 33 (1884); Kramer v. State, 16 Ala. App. 456,458, 78 So. 719, cert. denied, 201 Ala. 700, 78 So. 990 (1918). In substance, the first indictment charged that the defendant as an officer of Life Insurance Company of America embezzled a company check in the amount of $18,160.40 made payable to Alabama International Services, Incorporated. The second indictment charged that the defendant as an officer of the insurance company embezzled $62,283.92 in checks or money between April 1, 1978, and August 31, 1978.
After the State rested its case in chief, the defendant made a motion to exclude. It then became the duty of the trial court to determine if there was any evidence, even though entirely circumstantial, that the defendant was guilty. Parker v. State,395 So.2d 1090, 1099 (Ala.Cr.App. 1980), cert. denied,395 So.2d 1103 (Ala. 1981). In determining whether the trial court correctly overruled this motion, this Court can only consider the evidence which was before that court at the time the motion to exclude was made. McCoy v. State, 397 So.2d 577, 585
(Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala. 1981). In making such a consideration, this Court must accept as true the evidence introduced by the State, must consider that evidence in the light most favorable to the prosecution, and must accord the State all legitimate inferences arising therefrom. Johnsonv. State, 378 So.2d 1164, 1169 (Ala.Cr.App.), cert. quashed,378 So.2d 1173 (Ala. 1979).
By its very nature, the State's evidence was confusing and complex, involving several corporations, numerous financial transactions and diverse commercial activities. At the risk of oversimplifying, we include in this opinion only a brief skeletal outline of the State's evidence.
In January of 1976, the defendant was promoted by the Board of Directors to vice president and chief executive officer of Life Insurance Company of America. At this time the insurance company had no president. In February of 1978, the defendant became the president of the insurance company. The defendant had been in the accounting department of insurance companies since 1954 and had "a general or thorough understanding of insurance accounting principles."
Although the insurance company received monthly premiums from the holders of its life insurance policies, its main assets were its holdings at Point Aquarius, a resort area near Gadsden. Due mainly to the poor financial condition of Point Aquarius, in 1975 the insurance company's financial condition *Page 1386 
was in an "obvious mess" which became progressively worse as time passed. In 1977-78, the insurance company was "technically insolvent" and its financial condition was "very serious". By December 31, 1977, its capital was impaired and its liabilities were $850,000.00 greater than its assets. In September of 1978, it was placed under the supervision of State Department of Insurance. On December 15, 1978, the Life Insurance Company was placed in receivership and the management and control of the corporation were taken over by the State Insurance Department.
The Life Insurance Company owned certain lot installment sales contracts at Point Aquarius. Under this type contract, the purchaser made monthly payments to the owner of the contract on the installment price of the lot or condominium and received title to the property only after the full purchase price had been paid. Royal American Corporation of Louisiana and Continental Security Life Insurance Company of Missouri owned other sales contracts. Birmingham Trust National Bank held a first mortgage or lien on some of the lots in order to secure a bond issue at Point Aquarius.
Mainly for practical reasons, an oral agreement was reached between the defendant and Royal whereby the Life Insurance Company would collect the monthly payments on both its own and Royal's contracts. The Life Insurance Company would retain 15% of the monthly payments collected on Royal's lot sales installment contracts and remit the remainder to Royal. Under this agreement, the Life Insurance Company actually made some collections and remittances to Royal.
On June 3, 1977, the Life Insurance Company opened a special checking account for these monthly payments it was collecting by transferring $9,674.34 from its main account into the new L.I.C.A. Lot Collection Account. This account existed until August 23, 1977 — a total of almost three months.
At this time, the Life Insurance Company had six other checking accounts which had either ledger sheets or cash receipts and disbursements journals — recognized as standard methods of record keeping. However, the accounting for the L.I.C.A. Lot Collection Account was kept on a page of a "steno-type pad".
In August of 1977, the defendant, Richard Prince and Joseph Aldio formed Alabama International Services, Incorporated (AIS), for the purpose of making the collections on the lot installment sales contracts. Although there was no legal relationship between AIS and the Life Insurance Company, the three incorporators of AIS were also officers or employees of the Life Insurance Company. The defendant, the vice president of the Life Insurance Company, became the president of AIS. Prince, the comptroller and office manager of the Life Insurance Company, became the secretary and treasurer of AIS. Aldio, a convicted felon employed by the Life Insurance Company as a "policy consultant", became the vice president of AIS.
Royal had made its collection agreement with the Life Insurance Company and not with AIS. Royal never specifically authorized AIS to collect any money owed to Royal although Royal did receive payments from AIS and made no objection when the collection function was turned over to AIS.
On August 23, 1977, the defendant and Prince wrote a check on the Life Insurance Company's Lot Collection Account for $18,160.44. This check closed the Lot Collection Account. Of this total amount, $11,102.41 was owned by the Life Insurance Company. The remainder constituted proceeds from the collection of lot installment sales contracts owned by other corporations minus the Life Insurance Company's 15% collection fee.
That same day and in the same bank, the defendant opened an account in the name of AIS and deposited $8,160.44. With the remaining $10,000.00, he purchased a certificate of deposit for AIS. The conversion of this $18,160.44 constitutes the basis of the first indictment. *Page 1387 
In the following three months, the $10,000.00 certificate of deposit was used to secure three loans, officially in the name of AIS, totaling $10,000.00. A cashier's check resulting from the September loan was made payable to Aldio and was signed by the defendant and Aldio. The proceeds of the October and November loans were paid out in the form of cashier's checks payable to AIS and endorsed by Aldio and Prince.
On August 31, 1978, a little over one year after the AIS account had been opened, it was overdrawn in the amount of "six hundred and some odd dollars." This account was examined by an examiner for the Alabama Securities Commission who testified that the total of all the funds deposited in the AIS account between August 23, 1977, and August 31, 1978, to which the Life Insurance Company was entitled and which it had not received amounted to $123,863.92. During this same period numerous checks totaling $171,818.91 were drawn against the AIS account and made payable to Aldio or to cash. Of the ones payable to cash, more than 90% were endorsed by Aldio. During this time (August 23, 1977 and August 31, 1978), only two checks were signed by the defendant: a check for $3,000.00 payable to Aldio, signed by Aldio and the defendant and dated September 27, 1977, and a $150.00 check payable to Aldio signed by Prince and the defendant and dated September 30, 1977.
The securities examiner also analyzed the AIS account for the period between April 1, 1977, and August 31, 1978 — the period covered by the second indictment. He testified that $76,130.51 represented the net Life Insurance Company funds deposited in the AIS account and not returned to the Life Insurance Company. During this same period, $97,378.21 was withdrawn from the AIS account by checks made payable to cash or to Aldio. The defendant's signature or name only appears on the two checks mentioned above. This figure of $97,378.21 is greater than the $62,283.92 alleged in the second indictment because after the indictment was drawn the bank furnished additional documents which allowed the examiner to identify additional deposits belonging to the Life Insurance Company.
Some monthly payments on the lot installment sales contracts owned by Royal were deposited in the AIS account but never remitted to Royal. By the end of April of 1978, the whole lot collection situation had "deteriorated" to the point where Royal assumed the collection of its own contracts.
The only money the State could show that was actually received by the defendant was $4,200.00. This was a check from Aldio, drawn on his personal bank account, which the defendant deposited in his personal bank account in April of 1978. With the exception of this deposit, an examination of the defendant's bank account disclosed no unusually large deposits from August 23, 1977, to August 31, 1978. The securities examiner found nothing to indicate that the defendant was receiving large sums of cash during this period.
The State was unable to prove that any of the money diverted out of AIS went into the hands of the defendant. Aldio's personal check of $4,200.00 to the defendant could not be traced directly to the AIS account. The securities examiner testified to five checks written on August 9 and 17, 1978, which would, as he stated, "tend to show that some checks went somewhere where Mr. Hinds had an interest to protect." These checks were written to Georgia public utility companies and in connection with Peppers Fried Chicken. However, as noted in the Appellant's Brief, p. 13-14, "The name of the defendant does not appear anywhere on any of these checks, and the witness did not explain how these checks related to the defendant or further identify them or their purpose."
This constitutes the evidence presented by the State. Although entirely circumstantial, it constituted a prima facie case of embezzlement and was properly submitted to the jury.
"Embezzlement is said to be `a sort of statutory larceny, committed by servants *Page 1388 
* * * where there is a trust imposed.'" Knight v. State,152 Ala. 56, 58, 44 So. 585 (1907). A fraudulent intent is an essential part and the essence of the offense of embezzlement.Ex parte Cowart, 201 Ala. 525, 526, 78 So. 879 (1918); Reevesv. State, 95 Ala. 31, 43, 11 So. 158 (1892); Esdale v. State,37 Ala. App. 48, 54, 68 So.2d 512, affirmed, 260 Ala. 45,68 So.2d 519 (1953); Wall v. State, 2 Ala. App. 157, 56 So. 57
(1911). That intent is to fraudulently or unlawfully convert the property of another to the actor's own use or to deprive the owner of his property. Rogers v. State, 37 Ala. App. 8, 11,65 So.2d 525, cert. denied, 259 Ala. 124, 65 So.2d 531 (1953);Wall, 2 Ala. App. at 173, 56 So. 57. The criminal intent involves the wrongful or fraudulent appropriation of another's money, property or effects to the actor's own use. Esdale,37 Ala. App. at 54, 68 So.2d 512. "The fraudulent conversion denounced by the statute occurs when the use of the property is unlawfully appropriated; it is not dependent upon a converting or changing the property from its form." Abbott v. State,27 Ala. App. 87, 89, 167 So. 599, cert. denied, 232 Ala. 194,167 So. 602 (1936).
Because intent is inherently difficult to prove by direct evidence, its existence may be evidenced by the words and actions of the accused and may be inferred from all the facts and circumstances in the case. Reeves, 95 Ala. at 43, 51,11 So. 158; Enzor v. State, 27 Ala. App. 60, 63, 167 So. 336, cert. denied, 232 Ala. 256, 167 So. 340 (1936). Intent may be proved by circumstantial evidence and the reasonable inferences arising therefrom. "Fraud is rarely susceptible, in any case, of direct, positive proof for the reason that its ways are dark and sinuous, and its tracks carefully concealed." Reeves,95 Ala. at 43, 11 So. 158; Hollis v. State, 51 Ala. App. 181, 183,283 So.2d 632 (1973).
 "In embezzlement generally, . . . the very confidence and trust reposed furnish the most potent means for its accomplishment and effectual concealment, so that guilt can generally be established only by reasonable inferences drawn from the general course of conduct of such officer, agent, clerk or servant, with respect to the subject — matter of his trust, and from all the facts and circumstances surrounding his acts, which tend to throw light upon or illustrate their nature."
Reeves, 95 Ala. at 43, 11 So. 158.
The fact that the State did not trace any of the embezzled funds as having been received directly by the defendant is immaterial and without significance. "(I)t is wholly unimportant as to whether the defendant was the recipient of the benefits of the crime, or whether a third person reaped the benefits thereof." Lacy v. State, 13 Ala. App. 212, 225-26,68 So. 706 (1915). "If the money was embezzled by others, with the assistance and connivance of the defendant, the mere fact that he did not receive the fruits of the crime would not exculpate him." Kramer v. State, 16 Ala. App. 456, 457, 78 So. 719, cert. denied, 201 Ala. 700, 78 So. 990 (1918).
 "Fraudulent or criminal intent constituting a necessary element of embezzlement is the intent to embezzle or otherwise willfully and corruptly use or misapply property of the principal or employer for purposes other than those for which the property is held, and it is not essential that the accused shall intend to appropriate the property for his own personal use."
29 A C.J.S. Embezzlement § 12a (1965).
It was not necessary to show what became of the embezzled property or that any disposition of it had been made. Knight,152 Ala. at 59, 44 So. 585; Abbott, 27 Ala. App. at 89,167 So. 599; Hurst v. State, 21 Ala. App. 361 at 363, 108 So. 398. "(F)ew convictions could ever be had if the State was required to prove what an embezzler has done with the money or property converted by him or where he had fraudulently secreted it with the intent to convert it. It is utterly immaterial what became of the money after a fraudulent conversion of it or *Page 1389 
a fraudulent secretion of it with intent to convert it."Eggleston v. State, 129 Ala. 80, 84, 30 So. 582 (1900).
"Embezzlement is an offense that may be consummated in any manner capable of effecting it." Reeves, 95 Ala. at 51,11 So. 158. "In order to justify the submission of the case to the jury, it is necessary that there should be proof of at least some act from which the jury can infer that the offense was committed." Benefield v. State, 286 Ala. 722, 724,246 So.2d 483 (1971).
 "While the elements of the offense are clear, it is sometimes difficult to determine just what evidence is necessary to establish the fact of embezzlement. There must, at least, be some act indicating an intent to segregate the property from that held by the defendant as agent and hold it for himself, or deprive the owner of the same, or to convert it to his own use. He must assume personal dominion of the property." Knight, 152 Ala. at 58, 44 So. 585.
See also Hurst, 21 Ala. App. at 362-63, 108 So. 398.
In determining whether a defendant should have been given the general affirmative charge or a directed verdict, the State's evidence must be considered "in its most favorable light."Esdale v. State, 260 Ala. at 49, 68 So.2d 519. A general charge on the evidence "is always of doubtful propriety in a criminal case, and certainly should never be given, unless the evidence is conclusive in its character, and there is no fact to be drawn as matter of inference from the facts proved." Perkins v.State, 50 Ala. 154, 158 (1874). "The general charge should never be given, when there is any evidence, however weak and inconclusive it may be, tending to make a case against the party who asks it." Pellum v. State, 89 Ala. 28, 32, 8 So. 83
(1889). A directed verdict should not be given if there are "two theories of the case, one consistent with the guilt of the defendant, and the other equally consistent with his innocence, and both supported by the evidence in the case." Lee v. State,18 Ala. App. 566, 567, 93 So. 59 (1922).
We have no difficulty in concluding that the State presented a prima facie case of embezzlement against the defendant. The corpus delicti was unquestionably established. Circumstantial evidence of the defendant's knowledge and intent constituted substantial evidence of his guilty participation in the embezzlement.
At a time when the Life Insurance Company was technically insolvent and in desperate financial condition, the defendant deprived the company of its main source of income by turning over the lot collections to AIS. At the very minimum this deprived the Life Insurance Company of the 15% collection fee on the lots owned by Royal. As in Reeves, this could not have occurred without the defendant's knowledge and participation. The methods employed in accounting for the Life Insurance Company's Lot Collection Account and in the financial dealings of AIS are highly suspicious in and of themselves. They must be considered in determining the defendant's actual intent. The defendant's own extensive knowledge and experience in both accounting and insurance are factors which indict and incriminate rather than furnishing any source of exculpation or exoneration. The amount of money collected by AIS and paid to Aldio or dispersed to cash and the relatively short period of time in which this money disappeared are highly significant factors in light of the Life Insurance Company's failing financial condition. The only reasonable conclusion afforded by the evidence before the jury when the State rested its case was that the defendant had knowledge of and was at the very least assisting in an embezzlement conspiracy.
The defendant's defense was that, although the embezzlement was occurring, he had no knowledge and was not aware of it at the time of the conspiracy. He contended *Page 1390 
that during the periods covered by the indictments he was not involved in the day-to-day affairs of AIS because he was totally involved as president of the Life Insurance Company in trying to sell that company's assets and make it financially sound. We will not lengthen this opinion by reporting the details of the defense. We only state in conclusion that if the State's case was strong when the State rested, it was made even stronger by the defendant's testimony. The more the defendant tried to explain his conduct, the tighter he wove the web of circumstantial evidence spun by the State. The strength of the evidence against the defendant is demonstrated by the comments of the trial judge after the jury had returned its verdict and had been dismissed.
 "I want to say one thing, though, for the record. Mr. Smith (defense counsel), I know you feel bad about this verdict. Of course, I know Mr. Hinds does, but he was the one that was there. But trying this case from your angle was almost an impossible job. All that's involved in this case and — All that's involved in this case I really don't see how you could hope to win it. It just was an impossible job. Just no way, no way. I know Mr. Hinds doesn't think so, but the jury obviously thought so. And there was no doubt in my mind about his guilt of my own self just listening to it.
 "I know it's most disappointing, but this case is just — With all that went on in that business there would not be a soul who would go untouched in a case like this with any kind of a jury. It wouldn't matter what type of jury. No way. And you did a mighty good job. You tried hard and did fine, but you can't overcome impossible odds, and that's what this was."
We have reviewed the sufficiency of the circumstantial evidence presented in this case in light of the governing principles found in Dolvin v. State, 391 So.2d 133 (Ala. 1980), and Cumbov. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979). We find that the issue of the defendant's guilt or innocence was properly submitted to the jury and the verdict of guilty is supported by substantial evidence.
 II
The trial court properly refused to allow the defendant to introduce into evidence a number of documents concerning various offers to purchase Point Aquarius. These documents "were often quite lengthy and complicated." Their purpose was to prove that the extent of the defendant's daily involvement in the operation of the Life Insurance Company made it impossible as a practical matter for him to oversee or have any knowledge of how Aldio and Prince were managing AIS.
Contrary to the defendant's contention, it can just as easily be argued that the fact that the defendant was so involved in the management of the Life Insurance Company must have made him aware that the only source of the company's investment income was being rapidly dissipated. For this reason, and because the documents were "quite complicated" and would only lend confusion to a trial already filled with numerous and complicated documents, we find that the trial judge did not abuse his discretion in excluding the exhibits. See C. Gamble,McElroy's Alabama Evidence, Section 21.01 (1) and (3) on relevancy (3rd ed. 1977).
 III
The defendant offered the testimony of a bank president to show the defendant's bad financial condition as "an indication that he did not in fact receive the amounts of cash as alleged in the indictment." The trial court properly excluded such testimony as "irrelevant and immaterial".
The State never contended and was not required to prove that the defendant profited by his crime. Lacy v. State, 13 Ala. App. 225
-26, 68 So. 706; Kramer v. State, *Page 1391 16 Ala. App. at 457, 78 So. 719. Thus, the evidence was immaterial.McElroy, Section 21.01 (1).
The defendant argues that, if the State may use the improvement in a defendant's financial condition to prove his guilt, "both logic and fundamental fairness dictate that a defendant be allowed to prove that he did not receive the fruits of the crime as tending to prove he did not participate in the crime." The properly stated rule is that "the fact of a person's possession of money, without some fairly reasonable indication that the money was acquired from the particular source of the now-charged crime, is not provable for the purpose of showing that the accused acquired it from such particular source" because the inference to be drawn from mere possession is too weak. McElroy, Section 50.01, citing Leath v.State, 132 Ala. 26, 31 So. 108 (1901); Turner v. State,124 Ala. 59, 27 So. 272 (1900).
Here, the offered evidence of the defendant's indebtedness was properly excluded as having "no legitimate tendency" to prove that the defendant did not participate in the embezzlement. Leath, 132 Ala. at 29, 31 So. 108.
While the State may prove the accused's "impecuniousness before the crime and his sudden affluence afterwards", McElroy, Section 50.21, the accused is not always entitled to prove his financial worth in order to show an absence of motive. Parsonsv. State, 251 Ala. 467, 478, 38 So.2d 209 (1948). Whether a defendant's strong financial condition is material in "peculative cases" to show the absence of motive, depends upon the circumstances and incidents of the occurrence, and the probability of it being influential under the circumstances.Parsons, 251 Ala. at 478-79, 38 So.2d 209. Thus, it has been held that the wages the accused was receiving at the time of the larceny is irrelevant. Dorsey v. State, 110 Ala. 38,20 So. 450 (1895). Here, we find no abuse of the trial judge's discretion.
 IV
On rebuttal, the State was allowed to prove that the defendant received a $1,500.00 kickback in the public restroom of a motel incident to the defendant's signing a rental guarantee for Spicer's Fried Chicken, a matter which the defendant had denied. This did not constitute impeachment on an immaterial matter because it contradicts the defendant's testimony that he had no knowledge that AIS was draining the assets of the Life Insurance Company. As argued by the Attorney General, the defendant's "whole defense consisted of a claim that he was an honest, if ill-advised perhaps even negligent corporate official, who tried desperately to save his beleaguered company. This evidence showing the defendant taking a bribe in a public restroom in return for imposing additional obligations on his foundering company contradicts the false image the defense sought to project." The evidence was properly admitted.
Additionally, the defendant's objection came after most of the testimony concerning the kickback had been given and was not accompanied by a motion to strike. Embrey v. State,283 Ala. 110, 116, 214 So.2d 567 (1968). Furthermore, the specific ground of objection raised on appeal (impeachment on an immaterial matter) was not presented to the trial court (objection "unless it is tied in some way with" the Life Insurance Company). Cook v. State, 384 So.2d 1158
(Ala.Cr.App.), cert. denied, 384 So.2d 1161 (Ala. 1980).
 V
Also not properly preserved is the defendant's argument that by allowing the prosecutor to ask if the defendant knew that Aldio had been convicted on "five charges of fraudulent conversion of other people's money and one charge of obtaining *Page 1392 
property by false pretense" the trial judge violated the rule of improperly assuming facts not in evidence. The objection at trial was that the facts solicited "would be more prejudicial than they would have probative value." "Only those grounds of objection presented to the trial court can serve as a basis for a reversal of its action." Cook, 384 So.2d at 1160.
 VI
The defendant argues that the trial court erred in admitting the State's evidence with reference to the $4,200.00 personal check that Aldio gave the defendant on April 14, 1978. This contention was answered in Snodgrass v. Branch Bank at Decatur,25 Ala. 161 (1854). See also Reeves, 95 Ala. at 43, 11 So. 158.
 "As a general rule, great latitude is allowed in the range of the evidence, when the question of fraud is involved. It is indispensable to truth and justice that it should be so; for it is hardly ever possible to prove fraud, except by a comprehensive and comparative view of the actions of the party to whom the fraud is imputed, and his relative position a reasonable time before, at, and a reasonable time after, the time at which the act of fraud is alleged to have been committed. No more precise general rule can be laid down in such cases." Snodgrass, 25 Ala. at 174.
Questions of the materiality, relevancy and remoteness of evidence in a fraud case rest largely within the discretion of the trial judge. His rulings on these questions will not be disturbed on appeal unless that discretion has been grossly abused. Dorcal, Inc. v. Xerox Corp., 398 So.2d 665, 671 (Ala. 1981).
We have reviewed and written to each argument presented by the defendant on this appeal. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
 *Page 1