Sessions Company appeals from a judgment entered against it in a fraud action in the Geneva County Circuit Court. We affirm.
Sessions is a corporation in southeast Alabama engaged in the business of buying, selling, storing, and shelling peanuts. The company has several buying stations, including one in Geneva, Alabama.
The Georgia-Florida-Alabama Peanut Association (GFA) is a cooperative organized for the purpose of collectively marketing peanuts on behalf of the producers. GFA also implements the federal government's price-support program by advancing to farmers the determined value of any "quota peanuts" placed with GFA. Quota peanuts consist of those peanuts necessary to meet domestic needs, as determined for each farmer by the Secretary of Agriculture and stated in terms of poundage. Peanuts produced above the quota are designated as "additional peanuts."
Charles Turner is a peanut farmer in Geneva County and has been a GFA member since 1959. As a farmer, Turner could either place his quota peanuts with GFA and privately sell any additional peanuts, or he could privately sell his entire crop.
In June 1980, Turner negotiated three contracts with the Sessions Company involving the sale of additional peanuts. In September 1980, Turner took his first load of peanuts to Buddy Ward, who operated Session's buying station in Geneva County. According to Turner, this exchange occurred between him and Ward:
 "It started inside the buying point. I went in and told Buddy, I said, `Buddy, I want you to put all the peanuts that I do not have contracted [with Sessions] into GFA.' And, he had something to do outside and we walked outside and he *Page 1389 
said, `Charles, I will be glad to do that but Sessions is going to buy them back.' I said, `They can't do that, Buddy.' He said, `Charles don't get ill with me. The law says we can and I just work here. Sessions says to buy them back, well, that is what I have got to do.' We talked about it a while as to whether there would be any benefits if they could buy them back or not. After our conversation was over I said, `Buddy, if you can buy them back, it will be all right for you to go ahead and sell them to Sessions, but if you can't, be sure that you put them in GFA.'"
Turner continued to deliver all of his peanuts — both quota and additional — to Sessions from September through November 1980. Altogether, he produced about 160 tons of peanuts: 142 tons of quota peanuts and 18 tons of additional peanuts. In the spring of 1981, Turner learned that federal regulations in 1980, in fact, prohibited the direct buy-back of quota peanuts placed in the co-op. Quota peanuts could only be bought through competitive bidding from a lot list.
Turner filed this action for fraud against Sessions, claiming $125,835.37 in compensatory damages, for the amount lost as a result of his not placing the quota peanuts with GFA, and punitive damages. Sessions counterclaimed for breach of contract, seeking damages of $41,526.17. The court denied Sessions's motion for a directed verdict, except on the issue of Turner's claim for punitive damages. The jury returned a verdict for Turner for $119,710.04, and against Sessions on the counterclaim. The court denied Session's motion for JNOV or new trial, and this appeal followed.
Sessions takes issue with the fraud claim, Ward's agency status, the propriety of the compensatory damages, the counterclaim verdict, and the admissibility of certain testimony. We address each issue in turn.
 Fraudulent Misrepresentation
The first issue is whether there was sufficient evidence on Turner's fraud claim to prevail against Sessions's motions for directed verdict, JNOV, and new trial. The law pertaining to fraudulent representations is stated in Code 1975, § 6-5-101:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
Regardless of whether the misrepresentations were made willfully, recklessly, or mistakenly, (1) there must be a false representation; (2) the false representation must concern a material existing fact; (3) the plaintiff must rely upon the false representation; and (4) the plaintiff must be damaged as a proximate result. Earnest v. Prichett-Moore, Inc.,401 So.2d 752 (Ala. 1981); International Resorts, Inc. v. Lambert,350 So.2d 391 (Ala. 1977).
We hold that there was sufficient evidence of fraud to sustain the jury verdict and withstand Sessions's motions for directed verdict, JNOV, and new trial. First, the false representation consisted of Ward's statement that the law allowed Sessions to buy the peanuts from GFA and that Sessions would do so. Second, the misrepresentation concerned a material existing fact in that Sessions actually was prohibited by federal law from purchasing the peanuts at that time. Third, Turner relied on Ward's representations, as evidenced by his decision to sell the GFA-intended peanuts to Sessions only after Ward assured him that Sessions had the authority to buy them. Finally, Turner was damaged as a proximate result of his decision to sell those peanuts to Sessions in that he would have received $119,710.04 if he had placed the peanuts with GFA, as he initially planned. Therefore, the elements of the fraud claim were substantiated by the evidence. *Page 1390 
 Agency Status
The second issue Sessions raises is whether Buddy Ward was an agent of the company or was an independent contractor. If Ward was a company agent, then Sessions would be liable to Turner under the doctrine of respondeat superior. The test of whether the relationship is that of independent contractor or of employer-employee is whether the alleged employer has reserved the right of control over the means and agencies by which the work is done, not the actual exercise of such control. Sawyerv. Chevron U.S.A., Inc., 421 So.2d 1263 (Ala. 1982); TuscaloosaVeneer Co. v. Martin, 233 Ala. 567, 172 So. 608 (1937). For one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished. Weeks v. C.L. Dickert LumberCo., 270 Ala. 713, 121 So.2d 894 (1960). Because working relationships take a wide variety of forms, each case must depend on its own facts, and all features of the relationship are considered together. Burbic Contracting Co. v. Willis,386 So.2d 419 (Ala. 1980).
There is evidence in the record that Sessions retained and exercised the right to direct the manner in which Ward purchased the peanuts for the company. Ward testified that he received and followed instructions from Sessions concerning the purchasing of peanuts. These instructions included the price to be offered and the right to sign contracts for additional peanuts. Ward also testified that the materials used in purchasing were furnished by Sessions. The fact that Ward opened and closed the Geneva station each season and that he was responsible for hiring and paying his own crew is not determinative. Sessions directed the manner in which the essential business of the company was conducted. The jury, therefore, had ample evidence from which to determine that Ward was an agent of Sessions.
 Compensatory Damages Award
Sessions also contends that the jury improperly determined the amount of compensatory damages. The general rule is that compensatory damages are intended only to reimburse one for the loss suffered by reason of an injury to person or property.Youngblood v. Bailey, 459 So.2d 855 (Ala. 1984); Matheny v.Petersen, 276 Ala. 478, 163 So.2d 635 (1964).
Turner introduced evidence that he would have received $119,710.04 if he had placed his 1980 quota peanuts with GFA, instead of selling them to Sessions. Sessions failed to offer any evidence contradicting this point. Furthermore, the company failed to offer evidence of any payments made to Turner for his peanuts, which might have mitigated the damages award. Instead, Sessions now argues that the amount should have been less because not all of the peanuts delivered to Sessions would have gone to GFA; Sessions argues that some would have gone to fulfill the three contracts with Sessions. We find this argument unpersuasive. Turner produced about 142 tons of quota peanuts and 18 tons of additional peanuts. Contrary to Sessions's argument, Turner's quota peanuts would not have gone to fulfill his performance under the contracts, because those contracts concerned only additional peanuts. Therefore, given that the only valuation evidence on the quota peanuts was uncontradicted, the jury's award is proper.
 Breach of Contract
Sessions contends that it was entitled to a directed verdict on its counterclaim for breach of contract. It is a well-established rule of contract law that where the language of the contract is unambiguous and plain, the court cannot alter it by construction, but rather must expound it as it is made by the parties. See, e.g., Holloway v. Jackson,412 So.2d 774 (Ala. 1982). *Page 1391 
Specifically, Sessions argues that Turner failed to deliver any peanuts under two of the three contracts for additional peanuts and that the company thus suffered damages of $41,526.17. According to Turner, however, he agreed only todeliver any additional peanuts he produced; he did not agree toproduce additional peanuts. We agree with Turner's reading of the contracts, both of which state:
 "A. Producer agrees to deliver . . . pounds of Segregation 1 peanuts unless:
 "(1) the quantity of such peanuts produced by the producer on the farm is less than the amount specified in this paragraph in which case the producer is required to deliver only the quantity so produced. . . .
". . . .
 "B. Producer agrees to deliver . . . pounds of Segregation 1 peanuts except:
 "(1) producer shall retain the right not to deliver the full poundage contracted for under this paragraph if a sufficient quantity of Segregation 1 peanuts are not produced to fill the farm poundage quota as quota peanuts, the poundage specified in paragraph A above, and the poundage contracted for under this paragraph. In such case producer shall have the right to apply his production first to meet his farm poundage quota and the poundage specified in paragraph A above, and the balance, if any, shall be delivered under this contract. . . ."
Turner produced about 160 tons of peanuts in 1980: 142 tons of quota peanuts and 18 tons of additional peanuts. Consequently, Turner produced enough additional peanuts to fulfill only one of the three contracts with Sessions. No additional peanuts were available to fulfill the other two. According to the clear language of the contract, in the event of such a shortfall, Turner was excused from performance under these contracts. Therefore, the trial court properly denied Sessions's motion for directed verdict on this issue.
 Admissibility of Certain Testimony
Finally, Sessions argues that the trial court erred in admitting testimony by other farmers who were allegedly defrauded by Sessions. Generally, previous similar acts are admissible to show fraud, scheme, motive, or intent. Winn-DixieMontgomery, Inc. v. Henderson, 395 So.2d 475 (Ala. 1981); Roanv. Smith, 272 Ala. 538, 133 So.2d 224 (1961). The trial court has wide latitude in regard to testimony in fraud cases because often the perpetrator is the sole possessor of the actual knowledge of the fraud. Winn-Dixie, supra; Snodgrass v. BranchBank at Decatur, 25 Ala. 161 (1854). The trial court's rulings will not be disturbed on appeal unless that discretion has been abused. Hinds v. State, 423 So.2d 1382 (Ala.Crim.App. 1982);Dorcal, Inc. v. Xerox Corp., 398 So.2d 665 (Ala. 1981).
We do not find that the trial court abused its discretion in allowing this testimony. The record reflects that the court ensured that the testimony was confined to the issue of fraud.
The judgment of the trial court is affirmed on all issues.
AFFIRMED.
TORBERT, C.J., and JONES, BEATTY and ADAMS, JJ., concur.
 *Page 293