United Services Automobile Association ("USAA") brought this action against Larry and Tracie Wade ("the Wades") for a declaratory judgment, seeking a determination of its nonliability under a homeowner's insurance policy purchased by the Wades. The Wades counterclaimed, seeking recovery under the policy for loss of their house and its contents, and seeking punitive damages for USAA's alleged bad faith in refusing to pay their claim.
The case was tried without a jury, and the trial court entered judgment against USAA on its complaint for declaratory judgment and in favor of the Wades on their counterclaim. The trial court entered judgment against USAA on the contract claim in the amount of $166,795 plus $21,962.21 interest for loss of the house and its *Page 908 
contents, together with $100,000 consequential damages. The trial court also entered judgment against USAA in the amount of $3,500,000 for its bad faith in refusing to pay the Wades' claim.
USAA filed motions asking the court to alter, amend, or vacate the judgment, or to order a remittitur or a new trial. The trial court denied these motions, and USAA appeals.
The Wades owned a house that was insured by USAA. The house was insured for $84,700 and the contents for another $84,700. On October 30, 1984, the house and its contents were completely destroyed by fire. The Wades notified USAA within 24 hours. At the conclusion of its investigation, USAA elected to deny the Wades' claim, asserting arson and misrepresentation on the part of the Wades as grounds for the denial.
At trial, USAA called as a witness Deputy State Fire Marshal Richard Montgomery, who had investigated the fire. On cross-examination, counsel for the Wades asked Montgomery if the Wades were suspected of setting the fire. USAA's objection to this question was overruled and Montgomery testified that the Wades were never suspects in the criminal investigation. USAA argues that the trial court erred in allowing Montgomery to testify that the Wades were never suspected of arson.
USAA has cited numerous cases from other jurisdictions that hold that evidence of non-prosecution for arson is not admissible in a subsequent civil action arising out of the same event. Among the cases cited by USAA are Rabon v. GreatSouthwest Fire Ins. Co., 818 F.2d 306 (4th Cir. 1987); Kelly'sAuto Parts, No. 1, Inc. v. Boughton, 809 F.2d 1247 (6th Cir. 1987); Galbraith v. Hartford Fire Ins. Co., 464 F.2d 225 (3rd Cir. 1972); and Greenberg v. Aetna Ins. Co., 427 Pa. 511,235 A.2d 576 (1967), cert. denied, 392 U.S. 907, 88 S.Ct. 2063,20 L.Ed.2d 1366 (1968). Each of these cases holds, and USAA argues, that evidence of non-prosecution should not be admitted because of the higher burden of proof required in a criminal prosecution.
In each of the cases cited by USAA, it is evidence of non-prosecution that the policyholder seeks to elicit. In the present case, the Wades presented the testimony of the investigator that he had never suspected the Wades of arson, not evidence that they were not prosecuted. Although a prosecutor may consider the higher burden of proof in determining whether to bring charges, an investigator obviously does not consider burdens of proof in determining whether or not he suspects someone of arson.
One consideration in a bad faith case is what was known by the insurance company at the time of the decision to deny the policyholder's claim. It would be very relevant to the trial court to know that USAA knew that the investigator from the fire marshal's office did not suspect the Wades of arson.
USAA argues that there is no evidence in the record that USAA knew that Montgomery did not suspect the Wades of arson. Although there may have been no direct evidence of such knowledge, the evidence would support an inference that USAA knew that the Wades were not suspects. The record shows that when Montgomery conducted his investigation of the fire scene, USAA's investigator, Chris Lackey, was also present, and that they conducted their investigations together. The record also shows that when USAA's adjusters, Ed Kelly and Patrick Corr, interviewed the Wades concerning the fire, Montgomery was present. USAA also obtained a copy of Montgomery's final report. Taking into consideration these facts, the trial court did not err in admitting Montgomery's testimony that he did not suspect the Wades, because there was evidence that USAA knew or should have known of Montgomery's lack of suspicion.
USAA contends that the trial court erred in finding that USAA failed to establish arson and misrepresentation by the Wades. This Court has held:
 "To establish a prima facie case of arson for the purpose of denying coverage under the fire policy, the [insurance company] *Page 909 
would have to prove by competent and reliable evidence arson by someone, motive by the [policyholder] and unexplained surrounding circumstantial evidence implicating the [policyholder]. Lawson v. State Farm Fire and Casualty Ins. Co., 41 Colo. App. 362, 585 P.2d 318
(1978); Cora Pub, Inc. v. Continental Casualty Company, 619 F.2d 482 (5th Cir. 1980); Great Southwest Fire Ins. Co. v. Stone, 402 So.2d 899
(Ala. 1981)"
Mueller v. Hartford Ins. Co. of Alabama, 475 So.2d 554, 557
(Ala. 1985).
USAA argues that it did prove arson through the testimony of its expert, Chris Lackey, and the deputy fire marshal, Richard Montgomery. Lackey based his opinion that there was arson largely on a "spalling trail" that he found leading from the basement door toward the center of the room. Spalling occurs when cement is subjected to high temperatures and the moisture in the cement expands and causes the cement to explode, leaving a crater in the cement. In his investigation, however, Lackey did not clear the entire basement floor of debris. James Posey, the Wades' investigator, did clear the entire floor and discovered that spalling was prevalent over the entire floor and that there was no discernible "trail." USAA correctly points out that it is undisputed that the area in the center of the floor was spalled more deeply than the rest of the basement. The Wades produced evidence that this concentration of spalling was caused by gasoline, motor oil, transmission fluid, and paint that was stored in this area. Lackey testified that he found no remains of the containers in this area. Posey, on the other hand, testified that the containers could have been destroyed by the fire. Montgomery, who was with Lackey when the "spalling trail" was discovered, testified that he believed that the spalling indicated the presence of flammables, but that he believed that the fire started upstairs and not in the basement.
In its order, the trial court discussed the evidence concerning the alleged arson:
 "The court carefully considered Mr. Lackey's testimony and demeanor and carefully evaluated his investigative techniques. The court concludes that not only is Mr. Lackey's testimony as a whole completely void of credibility, but that the presentation of his testimony borders upon the perpetration of a fraud upon this court. For Mr. Lackey and USAA to present to this court a case so heavily dependent upon 'spalling' as this case, when it is indisputable that Mr. Lackey selectively cleared only those areas of the floor which supported this incredulous [sic] theory is reprehensible. . . .
 "Mr. James Posey was an expert presented to the court by the Wades. Mr. Posey carefully and professionally divided the scene into quadrants, photographed all phases of his investigation in its various stages, sifted the debris, inspected the electric panels, and performed a detailed, thorough and professional investigation.
 "Mr. Posey's pictures of the fire scene emphasized dramatically the fact that spalling was common to the entire basement floor, and not just the 'trail' delineated by Mr. Lackey. Mr. Lackey's failure to make these findings leaves this court with two possible conclusions, both of which are fatal to the position of USAA, (1) either Mr. Lackey deliberately and intentionally set out to manufacture an arson case, and went to such trouble to accomplish this as to deceive the court, or (2) his investigation was absolutely deficient, inept and inadequate.
 "In support of the latter conclusion, the court notes that Mr. Lackey's testimony was that he knew at once when he looked at the scene that this was a fire for profit. This is totally unbelievable and outrageous, and becomes more so when balanced against the thorough, careful, professional investigation conducted by Mr. Posey. The allegation of arson is a very serious allegation, and in good faith, the insurer owes to its insured a very thorough investigation.
 "To the contrary, in the instant case, it is clear to this court from the evidence *Page 910 
that USAA set out, within forty-eight hours of this fire, to find some means by which to deny their lawful obligation under the contract. To that end, they employed at best incompetent investigators, and at worst, unscrupulous ones."
In addition, Deris Olive, the fire chief, and Larry Glover, the police chief, entered the basement while the house was burning and removed several items. Both Olive and Glover testified that the basement was not burning at that time. USAA points out that, by the time that Olive and Glover entered the basement, the flammable liquid would have burned itself out. This assertion does not explain the fact, however, that the items removed by Olive and Glover were not damaged by the fire.
The second element in an arson defense is motive of the insured. Mueller, supra. USAA contends that it presented sufficient evidence to show motive on the part of the Wades. USAA relies on the following assertions to establish motive on the part of the Wades:
 1. The Wades fraudulently misrepresented and overvalued the extent and amount of their loss.
 2. There was testimony that there appeared to be less debris than one would expect in such a house fire.
 3. When Franklin Hill, an adjuster from USAA, interviewed the Wades, he noticed an inordinate amount of personal belongings for a family that had recently lost everything in a fire.
 4. Lackey testified that a number of items were not found in the debris that should have been found.
 5. The Wades listed rent as a living expense in their claim although they did not actually pay rent.
 6. Larry Wade's ex-wife testified that he had talked about burning the house because it was poorly constructed.
 7. The Wades' purchases for 1983 were nearly twice their available income.
The Wades argue, and the trial court agreed, that they did not misrepresent their loss and that USAA's evidence did not tend to prove that they did. The testimony that there appeared to be less debris than one would have expected came from Fire Chief Olive, who also testified that when he returned to the scene of the fire he was satisfied that there was more debris there than he had first thought. The Wades point out that when Hill interviewed them, they were in Tracie Wade's mother's house and that all of the belongings that Hill saw were Tracie's mother's. Lackey's testimony concerning the missing items was refuted by Posey, who testified that he found many of the items that Lackey did not find. The Wades point out that they never denied the fact that they had not yet actually paid rent for the house in which they stayed. The evidence shows that the Wades lived in a house owned by Tracie's mother and that the Wades had agreed to pay Tracie's mother when they received the proceeds of the insurance policy. The record also contains evidence that the Wades' house was well constructed. In addition, evidence was presented that Larry's ex-wife had ill feelings toward the Wades. USAA's last assertion set out above does tend to show that the Wades may have been experiencing financial difficulties, which may tend to show motive. The Wades, however, presented evidence that they were not experiencing financial difficulties but were doing well financially. USAA presented no evidence that there were any outstanding mortgages on the Wades' house, that the Wades had any large outstanding debts, or that the Wades had written any checks that were returned due to insufficient funds. Thus, none of USAA's assertions regarding motive was in fact borne out by the evidence, nor would they have held up after a competent investigation.
The third element of the arson defense is "unexplained surrounding circumstantial evidence implicating the [Wades]."Mueller, supra. USAA contends that the following "unexplained circumstances" tend to implicate the Wades:
 1. Larry Wade told Olive and Glover that they (the Wades) did not have insurance, although they had renewed their insurance policy only 29 days earlier.
 2. Larry's ex-wife testified that Larry had been involved in other fires. *Page 911 
 3. The Wades' alibi was that they had taken their young children to a late movie on a school night.
 4. When the Wades arrived at the scene, they drove slowly past the burning house before turning around and returning.
 5. The Wades were the last people in the house and there were no signs of forced entry.
With respect to USAA's first allegation, Larry Wade testified that he said that he "hoped" they had insurance. The evidence shows that the Wades had been experiencing difficulties with another insurance company concerning their insurance due to the company's agent's not remitting premiums to the company. It was, according to Larry, because of these problems that the Wades had purchased insurance from USAA and that he made the statement concerning insurance on the house.
As was previously mentioned, Larry's ex-wife harbored ill feelings toward the Wades. In fact, there was testimony at trial that she had said that she hoped she could testify at trial because she "owed Larry one."
The Wades have never denied that they drove past their house and turned around before returning to the house. The evidence shows that Tracie's mother had stopped the Wades on their way home and told them that their house was burning. The Wades said that when they arrived at the house they were upset and they drove past the house to give themselves an opportunity to regain their composure before facing the crowd that had gathered at the scene.
The facts that the Wades were the last people in the house, that there were no signs of forced entry, and that the Wades said they took their children to a late movie, simply do not imply that the Wades burned their own house.
USAA contends that it presented sufficient evidence to prevail on its defense of concealment and misrepresentation. The insurance policy contained a clause that said that USAA "do[es] not provide coverage for any insured who has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance."
USAA cites the following as evidence of concealment and misrepresentation on the Wades' part:
 1. The Wades submitted three receipts from Tracie's mother for rent that was never paid.
 2. USAA paid the Wades $5,000 to help defray living expenses during the investigation of the claim. The Wades used part of the $5,000 to "buy some cows."
 3. The Wades misstated the amount of their purchases in the two years preceding the fire.
4. The Wades overstated the value of their loss.
Ala. Code (1975), § 27-14-28, says that "[n]o misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy."
The Wades never denied that they had not paid Tracie's mother the rent that they claimed. The evidence shows that the Wades and Tracie's mother had agreed that she would be paid when the claim was settled and that the receipts were sent to USAA merely to show how much the Wades owed to Tracie's mother. USAA presented no evidence to the contrary.
The Wades do not deny that part of the $5,000 was used to buy cows. However, USAA presented no evidence to show that the use of part of the $5,000 to buy some cows was made "with actual intent to deceive as to a matter material to the insured's rights under the policy."
Statements three and four are interrelated. USAA contends that the Wades misstated the amount of their purchases in the two years preceding the fire so that they could increase the amount of their claim. The Wades testified as to the value of their property. USAA was entitled to an independent appraisal of the property, but *Page 912 
chose not to request an appraisal. The only evidence concerning the value of the property was that given by the Wades. USAA presented no evidence concerning the value of the property but merely made allegations that the Wades were trying to deceive it concerning the value. It is interesting to note that USAA first argued that the Wades had made these purchases and that they were having financial difficulties because of the purchases and now is arguing that the purchases were never made. We hold that the trial court did not err in holding that USAA failed to establish concealment and misrepresentation by the Wades.
The trial court also addressed USAA's misrepresentation defense in its order:
 "USAA presented a list of contents to the [Wades] in answer to the [Wades'] supplemental interrogatories which purports to support some discrepancy in the contents submitted by proof of loss. A cursory review of this list clearly demonstrates the continuing absence of good faith in the actions of this insurer. A vast majority of these items would be destroyed beyond recognition in a fire of any consequence, much less a fire which was allowed to burn itself out without any attempt to quench it, necessarily causing the fire to search for all available fuel. This is evidenced by the testimony of Mr. Posey and supported by the testimony of the other fact witnesses. To accept the position of USAA that failure to recover and identify every item in a residence is conclusive of anything is tenable [sic] and shocks the conscience of this court. Such a position would render virtually every homeowner in Alabama without insurance coverage."
USAA next argues that the trial court erred in awarding, under the contract claim, $100,000 in additional damages. The court indicated that, of this amount, $20,300 was awarded for additional living expenses and $79,700 was awarded for mental anguish and emotional distress.
After the fire, the Wades moved into a home owned by Agnes Carmichael, Tracie's mother. The Wades and Carmichael agreed that she would be paid rent in the amount of $700 per month, the rent to be paid when the Wades received the proceeds of the insurance policy. The Wades stayed in Carmichael's house for 17 months and then moved to another location for another 12 months while this action was pending. The trial court noted that the policy provided for additional living expenses and then held that $700 per month was a reasonable amount for fair rental value of a home under these circumstances and awarded the Wades $20,300 ($700 X 29 months). USAA contends that the expenses were not actually incurred by the Wades and that this amount is speculative.
This Court has held that "the general rule is that compensatory damages are intended only to reimburse one for the loss suffered by reason of an injury to a person or property."Sessions Co. v. Turner, 493 So.2d 1387, 1390 (Ala. 1986). It is equally well established that damages may not be awarded where they are remote or speculative. E.g., Cook v. Brown,428 So.2d 59 (Ala.Civ.App. 1982).
USAA argues that because the Wades did not pay Carmichael, the debt was not incurred. The evidence shows, however, that the Wades agreed to pay the rent when they received the proceeds of the policy. The debt was, therefore, incurred by the Wades, with payment due at the time they received the proceeds of the insurance policy.
USAA contends that the award for additional living expenses for the 12-month period after the Wades moved out of Carmichael's house was speculative. This argument is well taken. No evidence was presented that indicated where the Wades were, how long they stayed, or how much their living expenses were. "The rule has long been established that the party claiming damages has the burden of establishing the existence of and amount of those damages by competent evidence."Johnson v. Harrison, 404 So.2d 337 (Ala. 1981). The Wades did not present evidence of the amount of their additional living expenses for the 12-month period after they moved out of Carmichael's house. We hold, therefore, *Page 913 
that, in regard to the award for additional living expenses, a remittitur in the amount of $8,400 (12 X $700) is proper, and we condition our affirmance on the Wades' acceptance of such a remittitur. See Ala. Code 1975, § 12-22-71.
In addition to the award for additional living expenses, the trial court awarded $79,700 for mental anguish and emotional distress. USAA contends that this award was erroneous.
This Court has held that "the law in this state does not permit recovery for personal injury, inconvenience, annoyance, or mental anguish and suffering in an action for breach of a contract of insurance." Vincent v. Blue Cross-Blue Shield ofAlabama, Inc., 373 So.2d 1054, 1056 (Ala. 1979) (citations omitted); see also Alabama Farm Bureau Mut. Cas. Ins. Co. v.Smith, 406 So.2d 913 (Ala.Civ.App.), cert. denied,406 So.2d 916 (Ala. 1981). The trial court clearly attributed this award of damages to the contract count, so this appeal presents no question of awarding such damages under a bad faith claim. Cf.United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala. 1989); Chavers v. National Sec. Fire Cas. Co., 405 So.2d 1
(Ala. 1981). In a legitimate contract dispute over insurance coverage where there is no wrongful conduct by the insurer, mental anguish damages would not be recoverable. Therefore, the trial court erred in awarding the Wades $79,700 under the contract count for mental anguish and emotional distress, and we further condition affirmance on a remittitur in that amount.
USAA contends that the trial court erred in finding that USAA acted in bad faith in denying the Wades' claim for insurance proceeds.
This Court first recognized the tort of bad faith inChavers v. National Sec. Fire Cas. Co., 405 So.2d 1 (Ala. 1981). In Chavers, the Court held that "an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either '(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.' " 405 So.2d at 7, quotingVincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054,1067 (dissenting opinion of Embry, J.) (Ala. 1979). It is the second prong of the holding in Chavers that is at issue in this case.[1]
In Blue Cross Blue Shield of Alabama v. Granger,461 So.2d 1320 (Ala. 1984), this Court held:
 "It follows from [the language in Chavers] that the [insured] in a bad faith case may prove his case either by showing that the insurer refused to pay the claim, knowing there was no legitimate reason to refuse payment, or by showing that the insurer intentionally failed to investigate the claim to determine whether there was a legitimate reason for refusing payment.
 "In regard to the intentional-failure-to-investigate aspect of bad faith, this Court stated in Barnes, 405 So.2d at 924:
 " 'The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured. . . .' "
461 So.2d at 1327-28.
After a thorough reading of the record, we hold that the trial court did not err in holding that USAA's investigation was incomplete and that USAA's reliance on the investigation amounted to a "reckless indifference to the facts" and, thus, *Page 914 
that USAA violated the second prong in Chavers.
Chris Lackey conducted a cause and origin investigation for USAA. In his investigation he purported to uncover a "spalling trail" in the basement floor that, he testified, was consistent with a flammable liquid being poured on the floor and then being ignited. Lackey determined from the "spalling trail" that the fire was intentionally set. Lackey did not clear the remainder of the basement floor of debris so that he could determine whether there was spalling over the entire floor or just in the area of the "trail." Subsequent investigators discovered that there was spalling over the entire floor of the basement and that the "pour pattern" supposedly discovered by Lackey was simply part of the spalling across the entire floor, not a discernible trail. When Lackey discovered the spalling, he did not question the Wades as to whether there were flammables ordinarily present in the basement that would explain the spalling. Instead, he merely assumed that the spalling was the result of a flammable liquid pour.
The record also shows that Lackey did not examine the electrical system in the house. Lackey, himself, admitted that he did not even remove the cover from the fuse box in an attempt to determine if the fire could have been caused by the electrical system.
Because USAA did not inform its local adjuster that it had retained Lackey, that adjuster retained a second investigator, Daniel Slowick, to conduct a cause and origin investigation. After Slowick conducted his preliminary investigation, the misunderstanding was discovered and Slowick was instructed to discontinue his investigation. Prior to being instructed to discontinue his investigation, Slowick had sent a letter to USAA stating that it was his opinion that the fire originated in the living area of the house and not in the basement. Although Slowick did not complete his investigation, USAA was aware of his opinion when the decision was made to deny the Wades' claim.
In addition to Slowick's opinion that the fire started in the living area instead of the basement, Deputy Fire Marshal Richard Montgomery, who conducted his investigation simultaneously with Lackey, stated that it was his opinion that the fire started in the living area and not in the basement. Montgomery also stated that he never suspected the Wades of arson. USAA was aware of Montgomery's opinions when the decision was made to deny the Wades' claim.
In USAA's investigation of the claims, its agents did not interview the two men who first discovered the fire. Both men, Michael Winchester and James Woods, said that the fire was burning through the roof when they arrived and that the basement was not burning. Winchester also said that he saw a downed power line near the center of the roof where the flames were coming through.
While the house was burning, the fire chief and the police chief went into the basement. They both said that the basement was not burning at that time. USAA pointed out that when a flammable liquid is poured onto a cement floor and ignited it burns itself out quickly, and USAA argued that the liquids that were there had already burned themselves out. While in the basement, the fire chief and the police chief removed from the area several items that USAA contends had been soaked with a flammable liquid and ignited. These items were not damaged by the fire. This information was available to USAA at the time the decision was made to deny the Wades' claim.
USAA placed a great deal of emphasis on the results of its interview with Larry's ex-wife. During the interview, she told USAA's investigators that Larry had been involved in two prior fires and that prior to their divorce he had discussed burning his house. USAA's reliance on these statements was misplaced. After Larry and his ex-wife were divorced, ill feelings developed between them. At one place in the record, there is evidence that she said that she hoped that she could testify against Larry because she "owed Larry one." The *Page 915 
trial court characterized her testimony "as being totally lacking in credibility" and said, "This finding is based not only on her clear bias and prejudice, but on the court's observation of her demeanor while testifying. She was an absolutely unreliable witness."
This Court has held that "[w]hether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision is made."National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362
(Ala. 1982). Each of the facts discussed above was before USAA when the decision was made to deny the Wades' claim or would have been before USAA had it conducted a complete investigation. USAA, however, did not conduct a complete investigation. Therefore, the trial court did not err in holding that USAA acted in bad faith when it denied the Wades' claim under their homeowner's policy.
USAA next contends that the $3,500,000 punitive damages award was wrongfully imposed and is excessive in light of the gravity of the alleged wrong and the extent of harm caused by the alleged wrong and that the trial court erred in refusing to remit part of the judgment.
This Court discussed the factors to be considered when reviewing an award of punitive damages in Hammond v. City ofGadsden, 493 So.2d 1374 (Ala. 1986):
 "Our cases reflect a number of factors which are appropriate for the trial court's consideration: The culpability of the defendant's conduct, Ridout's Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala. 1981); the desirability of discouraging others from similar conduct, Ford Motor Credit Co. v. Washington, 420 So.2d 14 (Ala. 1982); the impact upon the parties, Alabama Power Co. v. Hussey, 291 Ala. 586, 285 So.2d 92 (1973). These are by no means exclusive. Justice may well require consideration of other factors, such as the impact on innocent third parties."
493 So.2d at 1379.
We expounded on our holding in Hammond in Green Oil Co. v.Hornsby, 539 So.2d 218 (Ala. 1989). In Green Oil we held:
 "The following could be taken into consideration by the trial court in determining whether the jury award of punitive damages is excessive or inadequate:
 "(1) Punitive damages should bear a relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
 "(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining the degree of reprehensibility.
 "(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
 "(4) The financial position of the defendant would be relevant.
 "(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
 "(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
 "(7) If there have been other civil actions against the defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award."
539 So.2d at 223.
We are aware of the fact that both Hammond and Green Oil are concerned with the trial court's review of a jury's award of punitive damages. Nevertheless, we are of the opinion that the factors enumerated in *Page 916 
those cases apply equally to the award of punitive damages in a case where, as in this case, the trial was to a judge without a jury.
The trial court, in an amendment to its order denying USAA's post-trial motions for the court to alter, amend, or vacate the judgment, or for an order granting a remittitur or a new trial, discussed its reasons for awarding $3,500,000 in punitive damages:
 "Some of the areas for consideration as set out in Hammond include the culpability of the defendant's conduct, the desirability of discouraging others from similar conduct and the impact upon the parties. Other considerations are for the court's sound discretion.
 "The decision in this case as rendered on April 10, 1987, was a decision given much thoughtful deliberation. Indeed, this court pondered over this case for several days before rendering a decision at all. There was never any bias, passion, prejudice or improper motive in the decision, and now after much careful reflection, the court expressly finds that bias, passion or prejudice have in no way influenced this decision.
 "A case was presented to this court which demonstrated clearly that an 'arson' case was literally manufactured against the Wades. Richard Montgomery, a state fire marshal, was called in immediately; a report by Daniel Slowick on December 7, 1985, was not only ignored, but Mr. Slowick was fired by USAA after submitting a report that did not conclude there was arson. Mr. Lackey was then retained [sic],[2] and he conducted what this court has already characterized as an incompetent investigation.
 "The photographs of Mr. Lackey's investigation, introduced by USAA, when compared to the photographs of Mr. Posey's investigation, graphically illustrate USAA's failure to act in good faith in this case. Mr. Lackey clearly set out to find enough evidence to allege arson, while Mr. Posey clearly set out to determine what the true facts were.
 "This court stated in the April 10, 1987, order that not one shred of evidence was presented by USAA in support of their position. After much deliberation and consideration, the court reiterates and readopts that position here. This was a clear case of attempting to avoid a lawful obligation by whatever means necessary.
 "The culpability of the defendant's conduct being proper for the court's consideration, Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125 (Ala. 1981) (cited in Hammond at 1379), this deliberate bad faith of USAA is relevant to the size of a verdict.
 "The desirability of discouraging similar wrongful conduct is also an area for the court's consideration, Ford Motor Credit Co. v. Washington, 420 So.2d 14 (Ala. 1982) (cited in Hammond at 1379). This is consistent with Alabama's punitive damages cases.
". . . .
 "The gravity of USAA's conduct in this case is overwhelming, and serious consideration is in order to weigh the impact of this conduct upon others. As stated in the April 10, 1987, order there is an underlying requirement of good faith and fair dealing in all contracts, including insurance contracts. Consumers must be able to enter into these contracts with some reasonable expectation that the insurer will act in good faith. A deliberate attempt to manufacture an arson defense, such as this case, calls for a [judgment] commensurate with the grave importance of insurance contracts to the public at large. This reasoning is supported by Hammond, where the Supreme Court finds that justice may require consideration of the impact upon innocent third parties. Hammond, at 1379. *Page 917 
 "This court has given thoughtful consideration to the mandates of Hammond, and after a careful review and examination of the evidence, the court finds that USAA's conduct was at best grossly reckless, with a total disregard for the facts, or at worst, a deliberate attempt to avoid a lawful obligation. The court also finds that it is necessary to impose a [judgment] sufficient to discourage similar wrongful conduct by this defendant or others, and that it is equally compelling that a [judgment] be rendered so as to offer a degree of protection to the insurance-consuming public.
". . . .
 "The court has reviewed the evidence in an attempt to give every benefit of the doubt to USAA in their respective positions. In that vein, the court has reviewed the evidence excluding that portion [that USAA considers] offensive.
 "Having done so, it is the express finding of the court that the legal and admissible evidence in this case, totally disregarding [the above mentioned evidence], does not provide one shred of credible evidence in support of the position of USAA."
We have considered the record and the trial court's orders in light of our holdings in Hammond, Green Oil, and other recent cases in which large punitive damage awards have been contested. We are of the opinion that the award of $3,500,000 punitive damages is excessive and should be reduced by $1,000,000. We therefore further condition our affirmance on the Wades' acceptance of a remittitur of $1,000,000 of the punitive damages award.
USAA finally argues that the award of punitive damages in civil proceedings concerning the tort of bad faith in Alabama violates the Constitution of Alabama and the Constitution of the United States. USAA did not raise its constitutional claim until its post-trial motion to alter, amend, or vacate the judgment, or to order a remittitur or a new trial. This Court has held that constitutional issues may not be raised for the first time in a post-judgment motion. Alabama Power Co. v.Capps, 519 So.2d 1328 (Ala.), appeal dismissed, ___ U.S. ___,108 S.Ct. 1723, 100 L.Ed.2d 188 (1988). This issue, therefore, presents nothing for this Court to review.
The judgment of the trial court is affirmed, conditioned on the Wades' acceptance of the remittitur of $1,088,100 ordered by this Court.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J.,* and MADDOX, SHORES, ADAMS,* HOUSTON and STEAGALL, JJ., concur.
[1] A discussion of all of the elements of bad faith is not necessary for a determination in this case. For a complete discussion of these elements, see National Security Fire Cas.Co. v. Bowen, 417 So.2d 179 (Ala. 1982); National Savings LifeIns. Co. v. Dutton, 419 So.2d 1357 (Ala. 1982); Gulf AtlanticLife Ins. Co. v. Barnes, 405 So.2d 916 (Ala. 1981); and BlueCross Blue Shield of Alabama v. Granger, 461 So.2d 1320 (Ala. 1984).
[2] Although this is a slight error in chronology — USAA had retained Lackey before it fired Slowick — the error is not material.
* Although Chief Justice HORNSBY and Justice ADAMS did not sit at oral argument, they have studied the record and listened to the tapes of oral argument.