ALMON, Justice.
Pennsylvania National Mutual Casualty Insurance Company appeals from a final judgment dismissing its counterclaim against William and Glenice Lane in the Lanes’ action for insurance benefits based on a fire that destroyed the Lanes’ home. Pennsylvania National’s counterclaim alleged that Mr. Lane had intentionally caused the fire.[1] The issue is whether Pennsylvania National presented substantial evidence that Mr. Lane had a motive to burn his home, an element of its arson defense to the insurance claim.
On May 26, 1992, a fire destroyed the Lanes’ Marshall County residence and its contents. The Lanes were out of state on vacation at the time of the fire. Before the Lanes left for vacation, Mr. Lane gave a key to the house to David Moon, a friend of one of the Lanes’ daughters, who was to check on the house while they were gone. On the night of the fire, Daniel Small, a teenaged neighbor, was outside near the Lanes’ home. He saw David Moon and another man go into the house, where they remained for approximately three to five minutes. Approximately 10 to 15 minutes after Moon and the other man left the house, Small noticed smoke coming from the house; he alerted his parents, who called the fire department.
Olen Morrison, a fire marshal and the assistant chief of the Boaz Fire Department, participated in extinguishing the fire, and he afterwards investigated the fire. Upon arriving at the house, Morrison found that the front door was locked and had to be kicked open to gain access to the burning house. He concluded from his post-fire investigation that there was no evidence of forced entry into any door or window of the residence. Morrison found some evidence indicating that the fire may have been intentionally set, and he requested that the State fire marshal’s office conduct a further investigation.
Larry Gardiner, a deputy fire marshal for the State of Alabama, determined that the fire was intentionally set. Deputy Fire Marshal James Epperson interviewed several people, including David Moon, in connection with the State’s investigation. Moon confirmed that he had been given a key to the Lanes’ residence and further stated that he had been in the Lanes’ house one or two times during the several days before the fire; that he had driven to the house the night of the fire; that he had noticed nothing unusual about the house at that time; and that he had returned to the house at approximately 3:00 p.m. the day following the fire.
The Lanes’ residence and its contents were insured by a policy of insurance issued by Pennsylvania National. Pennsylvania National retained Pyrtech, Inc., on May 29, 1992, to investigate the cause and origin of the fire. Jeffrey Crain, one of Pyrteeh’s investigators, examined the house on June 1, 1992. He concluded that the fire had been intentionally set in several independent areas throughout the main floor of the house. Crain determined from the patterns of burn- *373 mg that the fire was caused by the ignition of liquid accelerants that had been poured onto the floor in these areas.
On November 30, 1992, Pennsylvania National paid $18,887.75 to Mrs. Lane and $77,-955.59 to Transamerica Financial Services and Bank of Boston, the mortgagees listed on the insurance policy. These payments were for damage to the dwelling and to Mrs. Lane’s personal property. On July 26, 1993, Pennsylvania National paid $1,493.29 to Mrs. Lane for additional living expenses. Pennsylvania National denied any payment to Mr. Lane, contending that the residence was intentionally burned by someone acting on his behalf.
On September 16, 1993, the Lanes filed a complaint against Pennsylvania National, alleging breach of contract, fraud, and bad faith failure to pay their insurance claim. Pennsylvania National’s answer included a counterclaim alleging that Mr. Lane intentionally caused the fire and that Pennsylvania National, therefore, was entitled to recover from him the $98,336.63 it had paid to Mrs. Lane and to the listed mortgagees. The Lanes answered the counterclaim, denying that Mr. Lane had intentionally caused the fire or that he was guilty of any fraudulent conduct.
On December 21, 1993, the Lanes filed a motion for summary judgment on the counterclaim. The motion was supported by Mr. Lane’s affidavit in which he stated: “I did not have anything to do with causing the fire, nor did I pay anyone or request anyone to set the fire.” The parties concede that the Lanes’ motion, supported by Mr. Lane’s affidavit, was sufficient to shift the burden to Pennsylvania National to present substantial evidence creating a genuine issue of material fact as to whether Mr. Lane engaged in arson. For Pennsylvania National to establish a prima facie case of arson, it must prove that “(1) the fire was intentionally set; (2) [Mr. Lane] had a motive for committing the alleged arson; and (3) [Mr. Lane] either set the fire or had it set, which may be proved by unexplained surrounding circumstantial evidence implicating [Mr. Lane].” Shadwrick v. State Farm Fire & Casualty Co., 578 So.2d 1075, 1077 (Ala.1991); see Mueller v. Hartford Ins. Co., 475 So.2d 554 (Ala.1985); Great Southwest Fire Ins. Co. v. Stone, 402 So.2d 899 (Ala.1981).
As to the first element, the record contains no evidence supporting any theory of the cause of the fire but arson. As to the second element, Pennsylvania National submitted the statements of Mr. Lane made in a July 30, 1992, examination under oath to show that Mr. Lane had a motive to set fire to the Lanes’ residence.[2] Pennsylvania National concludes its argument relating to motive by stating: “Mr. Lane’s efforts to sell the house, the resulting friction with his wife, his interest in moving to Florida, his serious problems with his children and his unnatural desire to get away from his children certainly combine to show a motive by the insured for the destruction of the property.”
The statements of Mr. Lane upon which Pennsylvania National bases its conclusion and which it submits as substantial evidence of a motive by Mr. Lane to cause his home and its contents to be burned are as follows:
“Q. Had you ever either talked about putting the house up for sale or, in fact, put it up for sale?
“A. Oh, yeah. We—
“Q. When was that?
“A. After we moved up here [the house was purchased sometime in the early to mid-1980’s], we had been here a short time — a very short time — and she [Mrs. Lane] became very disenchanted with the house, and all my big ideas wasn’t going as fast, and she didn’t have all of her friends here, you know, and she — we were having family problems because of the move. So I just said, Well, we’ll just sell it then.’ So I put it up for sale. Well, then we took it *374 off the market because I started getting little things done along, and she started meeting more people, you know, making new Mends up here. So things kind of calmed down a little bit, and we took it off the market. Well, it wasn’t long after that that she got disenchanted again. So I said, Well, I’m just going to sell the house, you know, and just leave, you know.’ ‘No, you don’t.’ You know, this was one of them family arguments. Anyway, I put it on the market again. There for a while it seemed like every time she would get mad I would put it on the market. But I never had any intentions of selling it. I had intentions of being there until the day I died. And then if she’d have wanted to sell it, that would have been fine.
“Q. Who did you have it listed with when you had it listed?
“A. Well, I listed — I think the first time was right after we bought it. I listed it with the people we bought it from, Henderson Realty.
“Q. Okay. And then what about the second time?
“A. I think the second time, I think, it was E.R.A.
“Q. Have you had the house listed within the last two years?
“A. No.
“Q. Have you talked to anybody about selling the house or wanting to move out or wanting to move out of the state?
“A. Oh, I have always talked about selling the house. Or, you know, people come by and say they would like to buy it. And I said, ‘You can buy it,’ you know. Or somebody would say, ‘Is your house for sale?’ I said, ‘Everything I have got is for sale.’ I have always, you know — every house I have ever had, though, I have always said I was going to sell it or if you want to buy it, you know, or somebody says something about it. That is just standard for me.
“Q. Do you remember talking within the last couple of years of selling the house and moving to Florida?
“A. Oh, yeah. That was our dream. Of course, the house wasn’t up for sale after that. But our dream was getting rid of all the children — I mean, not getting rid of them — but—
“Q. I understand.
“A. —getting them all out on their own and going down into warm weather and not have to worry about the kids and not even have a telephone where they could call and ask for stuff or telling us all their problems and just go down there and enjoy life, you know, until I died. But, my goodness, I have talked about that four or five years. I even took a couple of trips down there, you know, and looked at places.
“Q. And was that within the last couple of years that you have gone to look?
“A. Yeah.”
The following exchange began with a response to an inquiry regarding past problems the Lanes had experienced in leaving their home to go on vacation:
“A. Just about every — well, when we first moved up here for the first four or five years or whatever when we went on vacation, all of our children went with us.
“Four or five years ago — I can’t remember exactly when — we went on the first vacation by ourselves, and it was the first time we never took any kids with us, left them all. Her [Mrs. Lane’s] mom and dad came up and stayed with them to watch them. Now, they were all just about in their teens, and her mom and dad is faMy old. When we got back, they had just about drove them crazy, and they had been into everything. They just couldn’t, you know, control them.
“The next year, we left — I don’t even remember who left where or who. That is the year, I think, we left and left Jennifer in charge, the oldest one. And we came back, and the pool was a wreck. The house was a wreck. I’m talking about junk, you know, throwed around and stuff. There had been a lot of parties plus her wedding party. She decided she was going to get married while we were gone. We didn’t know anything about it.
“Q. Well, at least it kept the expenses down for you.
*375 ‘A. No, it didn’t.
“Q. I didn’t mean to be facetious.
“A. No. That is far from it. The next year — I think it was the next year — we left my son and his wife and baby there — no. Well, maybe it was the next year. When you get to her, she’ll straighten it out. But I think it was the next year we left my son and his wife there. And when we came back, it was a disaster. They had messed up everything, tore up everything. They had a boy over there that was a buddy of his who was a druggie and let him live in there. And he had gone through my wife’s dresser — I’m getting into detail just to tell you the problems, you know. He had loaded up a lot of my wife’s underwear and put it in his suitcase, you know. He was a little bit — you know, those type problems.
“So the next year — which I know I left out a year somewhere. Anyway, when we went, we decided we was going to make sure none of the children was around the house, and we was going to make sure that no one was going to be going in there bothering it and everything was going to be taken care of. And we told all the kids, ‘Do not come to the house, or we’ll have, you know, the police to put you in jail.’ And I told David [Moon], I said, ‘If you see them over there, tell them one time to get gone. And if they don’t or they’re there again,’ I said, ‘Go tell the police,’ or I said, ‘Call me.’
“Q. Is that what you were referring to when you had talked about telling [Police] Chief Amos that you were out of town and that you had had problems previously, that basically—
“A. He knew this.
“Q. It was kid stuff.
“A. Right.
“Q. Your children.
“A. Right.”
“Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989). Here, then, Mr. Lane’s statements must be such that a juror could reasonably infer from them that he had a motive to burn his own home and its contents. We find that such an inference would not be reasonable. Although the desire to move, coupled with the inability to sell a current residence, has been listed as circumstantial evidence of motive to intentionally burn the residence, see Shadwrick, 578 So.2d at 1078; Fondren v. Allstate Ins. Co., 790 F.2d 1533, 1535 (11th Cir.1986),[3] the facts of this case are not sufficient to support such an inference. Mr. Lane stated that he was never serious about selling the house and that it had not been listed in the past two years. There is no counter evidence implying that the prior listings were serious efforts to sell the house,[4] that Mrs. Lane was disenchanted with the house at any time but during the Lanes’ first few years there, or that Mr. Lane’s interest in moving to Florida was a pervasive consideration in his life.
Additionally, it would not be reasonable to infer that the problems Mr. Lane described with his children would provide him with a motive to burn his house. It is also probably not “unnatural,” under the circumstances, for Mr. Lane to desire to move to warm weather away from his children, but, again, it does not follow that this provides a motive for Mr. Lane to burn his house. Thus, even when viewed in a light most favorable to Pennsylvania National, Mr. Lane’s statements, when taken in context, simply do not support the inference that he had a motive to intentionally set fire, or to have someone else set fire, to his home.
In the cases we have reviewed on this issue, the most common evidence discussed as supporting the motive element of arson deals with the financial condition of the in *376 sured or the prospective financial benefit an insured stood to receive from the burning of the insured’s property. See Shadwrick, supra (noting that the evidence showed the insured had two mortgages on the burned house, the insurance proceeds would pay the insured’s debts and leave cash in hand, and the insured had insufficient income to support her children and attend school full-time); Bush v. Alabama Farm Bureau Mut. Casualty Ins. Co., 576 So.2d 175 (Ala.1991) (citing the insured’s “financial trouble”: three mortgages on the burned house, monthly bills equivalent to monthly income; being made defendants in a lawsuit claiming $50,000 in damages); Bryant v. State Farm Fire & Casualty Ins. Co., 447 So.2d 181 (Ala.1984) (insured did not make enough money to cover her debts, had two mortgages on the house, and was receiving money from her mother); Stone, supra (noting that the insurance proceeds would leave the insured with $9,000 cash in hand); Fondren, supra (evidence that the insureds were “in extremely poor financial condition”). In Williams v. Allstate Ins. Co., 591 So.2d 38 (Ala.1991), this Court affirmed a judgment entered on a jury verdict for the insurance company in its declaratory judgment action against the insured. In reviewing whether the circuit court erred in denying the insured’s motion for a summary judgment on his counterclaim alleging breach of contract and bad faith, the Court concluded that there was substantial evidence of the motive element of the insurance company’s arson defense, because the insured was in Chapter 11 bankruptcy and in “financial need.” Id., 591 So.2d at 41.
There is no evidence that the Lanes were in any kind of financial need. In Mr. Lane’s examination under oath, he was asked many questions concerning his income, his bills, and the mortgages on the house. Pennsylvania National makes no allegation, and we have found no indication in the record, that the Lanes had excessive debts or were otherwise in any sort of financial need. Additionally, we find no evidence in the record indicating that the insurance coverage on the Lanes’ house exceeded its value. Thus, the application of existing precedent to these facts would not support a conclusion that in opposition to the Lanes’ motion for summary judgment Pennsylvania National presented substantial evidence of the motive element of its arson claim. Cf. United Services Auto. Ass’n v. Wade, 544 So.2d 906 (Ala.1989) (affirming a judgment based on a verdict for the insureds on a bad faith counterclaim and noting that the insureds’ purchases over the year preceding the fire were twice their available income, but that there was no evidence of outstanding mortgages on the house, large outstanding debts, or checks returned for insufficient funds).
As to the third element of an arson defense to an insurance claim, the requirement of unexplained surrounding circumstantial evidence implicating the insured, we note generally that the evidence in the record circumstantially implicates David Moon in setting fire to the Lanes’ residence, but that there are very limited facts from which it could be inferred that the fire was set at Mr. Lane’s direction. The strongest fact is probably that Mr. Lane gave Moon a key to the house; we do not, however, decide whether this would constitute substantial evidence of the third element of arson. It is sufficient to note that any evidence implicating Mr. Lane is far from being so compelling as to raise an issue as to whether the motive element should be relaxed under the circumstances.[5]
Because Pennsylvania National failed to oppose the Lanes’ motion for summary judgment on the counterclaim with substantial evidence directed to the motive element of its arson defense, the circuit court properly entered the summary judgment for the Lanes on Pennsylvania National’s counterclaim.
AFFIRMED.
SHORES, HOUSTON, INGRAM, COOK and BUTTS, JJ., concur.

. The circuit court’s February 15, 1994, judgment states in part:
"The court is of the opinion that the defendant has failed to submit substantial evidence of such and that the matters presented are speculative and conjectural. The court considers the fact, properly or improperly, that the action is relatively new, having been filed in September, 1993, and that the counterclaim may be more fully developed by discovery and investigation. However, the complaint alleges that the fire occurred in May, 1992, giving the defendant almost two years to investigate the matter, with the results presented here.”

. There are statements in the affidavits of Olen Morrison and James Epperson submitted by Pennsylvania National in opposition to summary judgment on the counterclaim that could be considered as evidence tending to show motive. The statements, however, do not meet the require-merits of Rule 56(e), Ala.R.Civ.P., as to setting forth specific facts admissible in evidence and we, therefore, do not consider them in deciding whether Pennsylvania National presented substantial evidence of motive.

. The Shadwrick and Fondren decisions refer to additional factors, including financial concerns, in reviewing the evidence of motive for committing the alleged arson.

. We note that Pennsylvania National was given the names of the realtors with whom the house was listed and probably could have discovered the extent to which the Lanes pressed for the sale of the house.

. We assume, without deciding, that there may be circumstances in which the evidence implicating the insured is so compelling that lack of evidence of a motive may be irrelevant.