MOORE, Judge.
M.H. (“the mother”) appeals from a judgment of the Lee Juvenile Court (“the juvenile court”) awarding legal and physical custody of V.F. (a daughter born on January 16, 1996), R.F. (a son born on January 4, 1998), A.F. (a son born on November 9, 1999), L.F. (a son born on January 27, 2001), and F.F. (a daughter born on March 14, 2003) (collectively, “the children”) to their father, B.F. We affirm in part and reverse in part.

Procedural Background

On May 7, 2010, the Lee County Department of Human Resources (“DHR”) filed petitions with the juvenile court alleging that the children were dependent because the mother and B.F. (“the father”), who had been involved in a relationship for 17 years, had recently separated and that the mother and the father disagreed as to with whom the children should live and were engaging in actions adversely affecting the children’s welfare by “pulling [the chil *413 dren] back and forth and [the children] do not have a stable and healthy environment as a result.” DHR also alleged that “the mother went to the [children’s] schools with a video recorder to speak with the children and record them” and that the mother “has exhibited other irrational behaviors and may need a mental health assessment.” More specifically, DHR alleged that, as to L.F., the mother had refused to provide the father with the child’s asthma medication, which had led to the child’s hospitalization.
On May 25, 2010, after a hearing, the juvenile court entered a pendente lite order placing the children in the temporary custody of the father, allowing the mother only supervised visitation, and scheduling a final hearing for August 20, 2010. The juvenile court appointed a guardian ad li-tem for the children and ordered the mother to submit to a psychological assessment.
On August 20, 2010, the scheduled trial date, the guardian ad litem sought a continuance because the mother had not submitted to the court-ordered psychological assessment. The mother’s appointed counsel objected, asserting that the father also should be required to undergo a psychological evaluation. The juvenile court continued the trial and ordered the father to submit to a psychological assessment.
On October 5, 2010, the mother was appointed new counsel; that new appointment was made because of changes in the juvenile court’s contract with appointed attorneys. On October 15, 2010, the mother’s new counsel requested a continuance of the case; on that same date, the mother’s new counsel filed her first discovery request. The juvenile court granted the mother’s discovery request, but it held in abeyance her request for a continuance of the final hearing; the juvenile court noted that the motion would be considered at the time scheduled for trial.
On October 20, 2010, the date scheduled for the final hearing, the juvenile court denied the mother’s motion to continue. The mother raised no objection to that ruling and, after briefly reviewing DHR’s discovery responses, indicated that she was ready to proceed. The cause was tried before the juvenile court, which received ore tenus evidence.
On October 21, 2010, the juvenile court entered its final judgment finding the children dependent, awarding custody of the children to the father, ordering the mother to pay child support, allowing the mother supervised visitation, and ordering DHR to supervise the case for the purpose of implementing counseling for the mother and the children. The mother timely filed her notice of appeal on October 27, 2010.

Factual Background

At the October 20, 2010, hearing, the evidence established the following. Farrell Seymore, the principal at Opelika Middle School, testified that, on one occasion during the spring of 2010, both the mother and the father arrived at the school and sought to check A.F. and R.F. out of school. Seymore testified that the school was unsure how to proceed because the mother and the father were disputing with whom A.F. and R.F. should leave and the school’s paperwork regarding A.F. and R.F. indicated that both parents held custody of them. Based upon instructions from DHR, Seymore allowed the children to decide with whom they would leave; they chose to leave with the father.[1] Sey-more testified that both A.F. and R.F. were A/B students and that, other than *414 their parents’ dispute regarding custody, the school had no other complaints or concerns regarding them.
Sherrioda Heard, the school counselor for the Opelika City School System, testified that she had had contact with V.F. and F.F. in April 2010 because they were frequently coming to school late and were leaving school early and it was beginning to affect the academic performance of at least one of them. Heard testified without objection that she had heard from others that the mother had arrived at the school with a video camera, which she had used to videotape V.F. and F.F.; Heard, however, had not witnessed that incident. Heard learned by the end of the school year that the father had received temporary custody of V.F. and F.F. and that they would be transferring to another school.
Britney Ware, a DHR assessment worker, first became involved in the case in February or March 2010 because of a report that the father was sexually abusing two of the male children; according to Ware, DHR could not substantiate that report and it was found to be “not indicated.” During that investigation, some of the children had reported to DHR that the mother had physically abused them and that they did not want to return home to her. DHR could not substantiate those reports, and those claims subsequently were found to be “not indicated.” It was during the pendency of that investigation, however, that Seymore contacted DHR and reported that the parents were frequently checking A.F. and R.F. out of school in an attempt to keep them away from the other parent as part of their ongoing custody dispute. DHR then filed dependency petitions regarding all the children.
Ware testified that she had learned that one of the children, L.F., had been hospitalized as a result of a severe asthma attack; the father had reported to Ware that the mother had refused to provide L.F.’s asthma medications to him. Ware testified that the children had indicated to her a preference to stay with the father; according to Ware, the children had reported that the mother regularly beat them with a metal baton and made them bathe immediately upon entering the house. Ware also testified that DHR was concerned that the mother might be emotionally unstable because she had left hostile messages on DHR’s answering machine and, according to Ware, appeared overly focused on the father rather than on the children.
Ware offered the results of a background check DHR had obtained on the father and his new live-in paramour, M.H. Both had criminal backgrounds, but both had tested negative for recent narcotic use. Ware indicated that DHR had no recommendation regarding placement of the children. Ware testified that, if the father received custody, DHR had no concerns for the safety of the children and recommended that DHR’s file on the family be closed. Ware testified, however, that if the mother received custody, DHR recommended that the juvenile court order family counseling and individual counseling for the mother.
Ware testified that, although the mother repeatedly had accused the father of coaching the children to make accusations against her, L.F. had reported that the mother had urged L.F. to lie to DHR regarding the type of discipline used by the mother. Ware acknowledged that, although the father had been ordered to submit to a psychological examination, he had not done so.
Ware admitted that the mother had filed criminal charges against the father stemming from a domestic-violence incident occurring on April 29, 2010, but, Ware testi- *415 fled, she understood that those charges had been “thrown out.” Ware admitted on cross-examination that the mother could be focused on the father’s tendency to act violently, rather than simply being focused on the father.
According to the father’s testimony, he and the mother had been in a relationship off and on for approximately 12 years; he later admitted that their relationship had spanned a longer period but that their actual time together had totaled only 12 years. The father testified that he and the mother had never married but that they had lived together sporadically. The father testified that, although he was the father of the five children and had been named on the children’s birth certificates, no court order regarding paternity or child support had ever been entered. According to the father, he and the mother had separated “for good” approximately five years before the final hearing. When the father had left the family home, all the children had remained with the mother.
The father testified that, in October 2009, the children had telephoned him stating that the mother had left them alone for two days. According to the father, he drove to the mother’s home and, upon finding the children unsupervised, took them with him. After he and the mother had a dispute regarding custody of the children, the father returned three of the children to the mother, but he kept R.F. and A.F. with him.
The father testified that the first time he saw V.F. after he returned her to the mother’s custody, she could barely walk; V.F. reported that the mother had beaten her. After examining V.F., the father contacted DHR. The father testified that, from that point forward, he attempted to check the children out of school before the mother could get to them; the father stated: “I knew that they had told on her and they was scared.” The father testified that the children did not like the schools they were attending at that time, so he withdrew them approximately one week before the end of the school year and enrolled them elsewhere. Although the mother had been awarded supervised visitation with the children, the father testified that the children did not want to continue those visits because the mother said things during those visits that made the children feel uncomfortable.
The mother testified that she and the father began living together in 1993 and that they had continued living together until June 2009, when she had moved out. She testified that the children had remained with her when she and the father separated. According to the mother, on December 12, 2009, the father became enraged because he believed that L.F.’s hair had been cut by another man; the mother testified that the father “stabbed the tires out” of her vehicle. According to the mother, she had taken a taxi to buy some “Fix-a-Flat” and, while she was gone, the father had taken all the children from her home. The mother acknowledged that the father subsequently had returned three of the children to her custody but that A.F. and R.F. had remained with the father.
The mother testified that, even though the children had expressed a preference to stay with the father, she believed they should return to her home. She agreed to attend counseling if necessary. The mother testified that, although the father had been abusive throughout their relationship, she had not filed any charges against him until 2005; she testified that, rather than filing charges, she had begun working with a domestic-violence intervention center. The mother testified to various domestic-violence incidents that had occurred throughout her relationship with the father.
*416 The mother denied that she made the report to DHR alleging that the father was sexually abusing two of the male children. According to the mother, the daughter of the father’s current girlfriend had made that report. The mother denied the father’s version of events regarding L.F.’s hospitalization and his asthma medication. She also testified that she never received a telephone call informing her that L.F. had been hospitalized.
The mother denied the children’s reports that she had beaten them with a baton; the mother testified that she had used a metal spoon, measuring 18 inches long, as a paddle in an attempt to discipline the children. The mother also denied that the children had been unhappy at their schools.
The mother testified that she believed that the father was preventing the children from seeing her and contacting her and that, as long as they were in his custody, she would be unable to have a relationship with them. She testified that if the children could not be returned to her, she believed that they should be placed in foster care so they could be in a neutral environment.
D.F., the mother’s oldest child, who was 20 years old at the time of the hearing and who is not the father’s biological child, testified that he had come to the hearing to ensure that his brothers and sisters were safe. According to D.F., the children had told him stories of physical abuse at the hands of the mother, which he said he believed. He testified that he had been removed from his mother’s home as a minor and had been placed in foster care because of physical and emotional abuse by the mother. He described an incident that occurred when he was a child that had resulted in his receiving stitches after the mother hit him in the head with a high-heeled shoe.
D.F. testified that he had last stayed in the mother’s home two years before the final hearing, for approximately a week; D.F. acknowledged that he and the mother had not parted on good terms. D.F. testified that he believed that the mother needed counseling. According to D.F., when he was younger, the father had served as a parental figure to him; D.F. testified that the father had never abused or mistreated him in any way.
The mother’s written psychological assessment, dated October 15, 2010, was admitted into evidence. In that assessment, the psychologist identified the mother as having a large number of antisocial personality characteristics. The psychologist, however, noted that the mother seemed to genuinely desire to parent her children; the psychologist recommended that the mother attend parenting classes, but she stated that she found no reason to require the mother’s visitation with the children to be supervised.
The juvenile court also admitted into evidence without objection letters allegedly written by the children and addressed to the court. In those letters, the children expressed that they loved the mother but that she frequently used a metal baton and metal spoon to beat them and had “body slammed” them, hit them with her fists, and busted their lips while disciplining them for such “infractions” as losing hair ribbons and inadvertently touching the sink while washing their hands. The children also indicated that the mother made them bathe immediately upon entering the house. All the children indicated that they wished to remain with the father.

Analysis

The mother first argues that the juvenile court lacked subject-matter jurisdiction. Specifically, the mother maintains that the case involved only a custody dis *417 pute between the mother and the father and that the juvenile court actually adjudicated a pure custody dispute between parents, which it had no authority to do. The mother further contends that DHR did not present clear and convincing evidence of the dependency of the children. We consider those two issues together.
The juvenile court first obtained jurisdiction over the case based on dependency petitions filed by DHR. In those petitions, DHR essentially alleged that neither the father nor the mother was capable of properly caring for the children and that the children needed the protection of the state. The specific allegations in DHR’s petitions, outlined above, clearly set forth a claim by a third party, i.e., a party other than the parents, that the children were dependent. See B.R.G. v. G.L.M., 57 So.3d 137, 140-41 (Ala.Civ.App.2010); see also § 12 — 15— 102(8)a.6. & 8. (defining “dependent child”). At that point, the case did not involve merely “a custody dispute between parents,” which would fall outside the dependency jurisdiction of the juvenile court. See § 12-15-114(a), Ala.Code 1975.
During the litigation, DHR apparently changed its position, offering evidence indicating that the father could properly care for the children. DHR did not, however, formally withdraw its dependency petitions and it appeared at trial with witnesses. In her brief to this court, the mother argues generally that DHR did not present clear and convincing evidence of the dependency of the children, but her argument rests primarily on the proposition that DHR attempted only to prove the facts alleged in its petitions, which the mother maintains do not rise to the level of dependency.[2] As stated above, those allegations, if proven by clear and convincing evidence, would have established the dependency of the children. Furthermore, and contrary to the mother’s contention, DHR did not limit its evidence to the allegations in its petitions; DHR also proved that the mother had physically abused the children. See M.M.S. v. D.W., 735 So.2d 1230, 1232 (Ala.Civ.App.1999) (“However, contrary to the mother’s argument, the juvenile court can find a child dependent based upon grounds not asserted in the dependency petition. Martin v. State Dep’t of Human Resources, 502 So.2d 769, 770 (Ala.Civ.App.1987) (stating that this court did not need to ‘find that the Department [of Human Resources] proved the specific grounds alleged in the petitions because we [found] that the juvenile court had other sufficient grounds for determining that the children are dependent.’).”). Based partially on that evidence, the juvenile court ultimately decided in its October 21, 2010, judgment that the children were dependent.
Hence, we conclude that the juvenile court did not adjudicate the issue of which of the two parents should have custody of the children, i.e., a mere custody dispute between the parents; rather, it decided, initially, whether the children were dependent within the meaning of § 12-15-102 and, secondarily, which custodial disposition would protect the safety and welfare of the children. We conclude that the juvenile court had ample evidence before it from which to make each determination and that it acted properly pursuant to its dependency jurisdiction.
Although recognizing that motions to continue are disfavored and are subject to a trial court’s discretion, the mother *418 next asserts that the juvenile court exceeded its discretion in failing to grant her motion to continue the final hearing. The mother argues that, on the date scheduled for the final hearing, her newly appointed counsel had just received discovery responses from DHR and had just received the results of the mother’s mental-health evaluation. The mother also asserts that the juvenile court’s stated reason for denying her motion to continue was unfounded.
We need not address this argument because the mother failed to preserve this issue for appellate review. At the final hearing, the mother’s counsel agreed with the juvenile court that, if she were allowed a short period to review the discovery responses and the results of the mother’s mental-health evaluation, she would be prepared to proceed with the hearing. After the juvenile court allowed the mother’s counsel time for the requested review, counsel represented to the juvenile court that she was ready to proceed. Thus, the mother’s counsel failed to lodge an objection to the juvenile court’s ruling on her motion.
By failing to object to the juvenile court’s ruling on her motion, the mother waived any error in that ruling. See, e.g., Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990) (refusing to address alleged error in the trial court’s ruling because no objection was raised; noting that a trial court will not be held in error unless that court has been apprised of its alleged error and has been given the opportunity to act thereon); and Hoefer v. Snellgrove, 288 Ala. 407, 409, 261 So.2d 431, 434 (1972) (“It is a well-settled principle of law that matters not objected to cannot be considered for the first time on appeal.”). We, therefore, need not address the mother’s argument on this issue further.
The mother next asserts that she was not afforded her due-process right to notice of the allegations against her. More specifically, the mother argues that because the dependency petitions did not allege physical abuse as a basis for the children’s dependency, she had no reason to believe that those allegations of physical abuse would be addressed at the dependency hearing and, therefore, she was not given the opportunity to adequately prepare a defense to such allegations.
The mother, however, failed to assert any constitutional challenge in the juvenile court, and, as a result, she has waived this constitutional issue for appellate review.
“Even constitutional issues must be properly preserved for appellate review. Brown v. State, 705 So.2d 871, 875 (Ala.Crim.App.1997). ‘Due process does not override the basic law of preservation, ... and the issue must first be presented to the trial court before it will be reviewed on direct appeal.’ Boglin v. State, 840 So.2d 926, 929 (Ala.Crim.App.2002).”
Byrd v. State, 10 So.3d 624, 626-27 (Ala.Crim.App.2008). See also Consolidated Pipe & Supply Co. v. City of Bessemer, 69 So.3d 182, 189 (Ala.Civ.App.2010) (quoting United Servs. Auto. Ass’n v. Wade, 544 So.2d 906, 917 (Ala.1989)) (“ ‘constitutional issues may not be raised for the first time in a post-judgment motion’ ”). Because the mother failed to preserve her constitutional challenge for appellate review, we need not address it further.[3]
*419 The mother next asserts that it was not in the children’s best interest to be placed in their father’s custody. Although the mother fails to cite relevant caselaw in support of her argument, we note that, in W.T.H. v. 915 So.2d 64, 71 (Ala.Civ.App.2005), this court stated: “In making a custodial disposition of a child who is found to be dependent, the trial court may ‘ “choose that alternative which it finds to be in the best interests of the [dependent child].”’ [W.T. v. State Department of Human Res., 707 So.2d 647,] 651 [ (Ala.Civ.App.1997) ] (quoting Wallace v. Pollard, 532 So.2d 632, 633 (Ala.Civ.App.1988)).” See also Ala.Code 1975, § 12-15-314(a) (addressing the options available to the juvenile court, once it has determined that a child is dependent).
Based upon the evidence before it, the juvenile court could have found that the children had expressed a preference for being in the father’s custody; that DHR had no concerns with the children’s safety while in the father’s custody; that, despite his criminal background and the allegations of domestic abuse asserted by the mother, the father was willing and capable of providing a suitable and stable home for the children; and that the children appeared to have thrived under the juvenile court’s pendente lite custody award to the father. Thus, the juvenile court had before it sufficient evidence from which it could have determined that the best interests of the children would be served by an award of custody to the father. We, therefore, reject the mother’s argument that the juvenile court exceeded its discretion in placing the children in the father’s custody-
As her final issue, the mother asserts that the juvenile court exceeded its discretion in ordering her visitation with the children to be supervised and that the juvenile court exceeded its discretion by failing to sufficiently specify the terms of that visitation. We agree only as to the latter part of her argument.
The guiding principle in determining visitation with a child who has been found dependent and brought under the jurisdiction and protection of the juvenile court is the child’s best interest. See Y.N. v. Jefferson County Dep’t of Human Res., 67 So.3d 76, 83 (Ala.Civ.App.2011). “The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision in this regard will not be reversed absent an abuse of discretion.” Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994). In exercising its discretion over visitation matters, “ ‘[t]he trial court is entrusted to balance the rights of the parents with the child’s best interests to fashion a visitation award that is tailored to the specific facts and circumstances of the individual case.’ ” Ratliff v. Ratliff, 5 So.3d 570, 586 (Ala.Civ. App.2008) (quoting Nauditt v. Haddock, 882 So.2d 364, 367 (Ala.Civ.App.2003) (plurality opinion)).
This court previously has addressed the appropriateness of requiring a noncustodial parent’s visitation to be supervised when necessary to protect the children from an unreasonable risk of physical or emotional harm emanating from the condition of the parent. See, e.g., Pratt v. Pratt, 56 So.3d 638, 642 (Ala.Civ.App.2010) (supervised visitation recognized as appropriate to address risk of harm to children posed by mother’s addiction to pain medication). A trial court may not, however, “ ‘select[ ] an overly broad restriction that does more than address a particular concern and thereby unduly infringe!] upon the parent-child relationship.’” Lee v. Lee, 49 So.3d 211, 214 (Ala.Civ.App.2010) (quoting Jackson v. Jackson, 999 So.2d 488, 494-95 (Ala.Civ.App.2007)).
In its final judgment, the juvenile court ordered the mother’s visitation with *420 the children to be supervised and ordered that it take place at “Family Connections.” Because the evidence was sufficient to support a finding that the mother had physically abused the children, it cannot be seriously disputed that the juvenile court acted within its discretion in requiring the mother’s visitation to be supervised.
The juvenile court, however, failed to specify dates and times for the mother’s visitation. Thus, the mother has no particular schedule applicable to her visitation with the children. At the final hearing, the mother testified that she had encountered difficulty exercising her visitation with the children at Family Connections; she explained that the children had been allowed to abruptly end the visitation sessions there and that, on some occasions, the children had not been present for visitation at all. Without a definitive schedule, the mother has no reasonable expectation of visitation or rights to rely on and she is unreasonably hampered in maintaining or rebuilding a relationship with the children. As this court has recognized, a trial court exceeds its discretion when it fails to provide a specific schedule of visitation for a noncustodial parent or when it allows a third party complete discretion over that schedule of visitation. See Pratt, 56 So.3d at 644-45 (citing numerous cases).
Because the juvenile court’s judgment failed to set forth a specific visitation schedule for the mother, we reverse that aspect of the judgment, and we remand the cause to the juvenile court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. It was unclear from Seymore's testimony whether he or another representative of the school had spoken with DHR.

. The mother does not argue that the children could not be found dependent because the father was capable of properly caring for them. See T.K. v. M.G., [Ms. 2091162, April 1, 2011] - So.3d -, - (Ala.Civ.App. 2011) (Moore, J., dissenting). Hence, we consider that issue to be waived.

. We also conclude that the issue of physical abuse of the children at the mother's hand was tried by the implied consent of the parties. Multiple witnesses testified to such abuse at the final hearing; however, the mother raised no objection to that testimony. See Rule 15(b), Ala. R. Civ. P.